John P. Flynn, Bar No. JF1987
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2130
Facsimile: (415) 947-2099

Matthew A. Macdonald (*pro hac vice forthcoming*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone: (323) 210-2953
Facsimile: (866) 974-7329

*Attorneys for Plaintiff*
*The J. Paul Getty Trust*

## UNITED STATES DISTRICT COURT

## SOUTHERN  DISTRICT OF NEW YORK

| | |
|---|---|
| THE J. PAUL GETTY TRUST, | )    CASE NO.: 22-cv-1838 |
| Plaintiff, | ) |
| v. | )    **COMPLAINT** |
| ALLIANZ GLOBAL INVESTORS U.S. LLC AND ALLIANZ SE, | )    **DEMAND FOR JURY TRIAL** |
| Defendants. | ) |

Plaintiff The J. Paul Getty Trust ("Getty") brings this Complaint against Defendants Allianz Global Investors U.S. LLC ("AllianzGI") and Allianz SE (together with Allianz SE, "Allianz") to recover the tens of millions of dollars in losses Getty suffered as a result of Allianz's mismanagement of the Structured Alpha investment strategy.

## NATURE OF THE CLAIMS

1.    Getty is a private, nonprofit cultural and philanthropic institution dedicated to the presentation, conservation, and interpretation of the world's artistic legacy. Through conservation work, publications, exhibitions, grant initiatives, training programs, and other efforts, Getty works to make a lasting difference in conservation practice and art historical research and to promote knowledge and appreciation of art among audiences of all ages.

2.    An important part of achieving these goals is maintaining and growing Getty's financial endowment. Getty's investment office oversees the endowment and invests in a variety of asset classes, including hedge funds.

3.    After years of following AllianzGI's Structured Alpha hedge funds, Getty decided to invest in 2016. By the end of 2019, Getty had invested $60 million in one such fund, AllianzGI Structured Alpha 1000 LLC (the "Fund"). The Getty's investment had grown to approximately $73 million by the end of 2019.

4.    Getty made and maintained those investments based on assurances from AllianzGI that "structural risk protections" were the cornerstone of Structured Alpha. While the Fund would generate returns through an options trading strategy, AllianzGI promised that hedges would be in place "at all times" to cap the downside risk of that strategy. AllianzGI told investors that these hedges would contain investment losses to a "defined maximum loss," and afford "protection" against a market crash. AllianzGI also assured investors that Structured Alpha would pursue a "risk-controlled return profile." And the investment strategy, AllianzGI claimed, would perform "regardless of market conditions" and whether markets were "rising or falling" or "smooth or volatile." The "nondirectional nature of our [option portfolio's] investment process," AllianzGI claimed further, "is one of its greatest strengths."

5.    These claimed protections were critical to Getty's decision to invest tens of millions of dollars in Structured Alpha and maintain those investments, especially given the risk profile Getty desired for its investments. Because the majority of Getty's endowment is

in equities, Getty believed that the Structured Alpha strategy would provide important diversification against the risk of a general market decline.

6.    Yet when equity markets declined, volatility spiked, and the option positions in the Fund were exposed to a heightened risk of loss in February and March 2020, on information and belief, those promised protections were absent. Unbeknownst to Getty, contrary to AllianzGI's stated investment strategy, and in violation of the fiduciary duties it owed as the Fund's managing member, on information and belief, AllianzGI had abandoned the hedging strategy that was the promised "cornerstone" of Structured Alpha, leaving the portfolio almost entirely unhedged against a spike in market volatility. To make matters worse, on information and belief, AllianzGI had placed a directional bet that volatility would remain relatively low, the equivalent of a ticking time bomb if its forecast (one it had promised "never" to make) proved wrong.

7.    On information and belief, as AllianzGI has since admitted, it constructed the portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March 2020. Contrary to its promise to investors that it would always purchase hedges as "protection" for the options it sold, on information and belief, AllianzGI had purchased *no* hedges for an entire segment of the portfolio. Meanwhile, on information and belief, the so-called hedges that AllianzGI did purchase were not the hedges AllianzGI said it would. AllianzGI had told investors it would buy hedges at a strike price 10% to 25% below the market, but, on information and belief, the hedges it actually held at the end of February 2020 were as much as 60% below the market. On information and belief, civen these and other departures from Structured Alpha's purported investment strategy, AllianzGI had constructed the portfolio not to pursue "risk-controlled returns" as it had promised but instead to earn marginal returns selling insurance against market volatility while maintaining no meaningful protection against the downside associated with the large tail risk of a market collapse—a strategy that has been aptly described as picking up pennies in front of a steamroller.

8.   In further derogation of its duties and scrambling to address the fallout from its recklessness, AllianzGI added yet more risk to the portfolio in February and March 2020. Whereas AllianzGI had told investors it would purchase **and maintain** hedges that would automatically cap the "maximum loss" investors could sustain in a market downturn, on information and belief, AllianzGI **sold** the hedges that could have protected Getty's investments and then added more risk-bearing positions in an apparent bet that the market would recover. On information and belief, these new risk-bearing positions were also built without an appropriate hedge in place, exposing the Fund to further, catastrophic losses and ultimately margin calls.

9.   AllianzGI's reckless actions, both in constructing the portfolio to bear excess, undisclosed risk and in restructuring the portfolio to chase returns rather than preserve investor capital, reveal that AllianzGI placed its own interests in generating performance fees ahead of its duty to safeguard investors' assets against undue risk.

10. Getty suffered substantial losses as a result of AllianzGI's misconduct. In a matter of weeks, AllianzGI had lost roughly 97% of Getty's investments—about $71 million. These losses far exceed what Getty would have lost had AllianzGI properly managed the Fund or had Getty invested its money in the equities markets or in a comparable, prudently managed investment strategy.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court also has subject matter jurisdiction over this action under Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1331, as the claims alleged herein arise under Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

13. This Court also therefore has supplemental jurisdiction over Getty's claims for fraud, negligent misrepresentation, breach of fiduciary duty, negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of Cal. Corp. Code §§ 25401, 25504.

14. Venue in this judicial district is proper under 28 U.S.C. § 1391(b), including because a substantial part of the events or omissions giving rise to Getty's claims occurred in this district. AllianzGI has also consented to venue in this judicial district in its agreements with Getty.

## PARTIES

15. Plaintiff The J. Paul Getty Trust is a California not-for-profit operating foundation with its principal place of business in Los Angeles, California. Getty operates an endowment with approximately $9.2 billion in portfolio assets as of December 31, 2021. The endowment's objective is to provide a stream of funding to support its various programs in the visual arts. Getty's investment staff has the responsibility to invest the assets to earn the best risk-adjusted return and to maintain the purchasing power of the endowment assets over time. Getty's investment portfolio is a sub-advised portfolio managed by multiple third-party investment managers. The investment managers are given discretion to invest assets subject to the applicable investment management agreements between Getty and the investment manager.

16. Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in New York, New York. As of December 31, 2019, Allianz managed more than $140 billion in client assets. AllianzGI is part of "Allianz Global Investors," the marketing name for a global asset management business operating through affiliated entities around the world. AllianzGI is the investment manager for the Fund. AllianzGI's ultimate corporate parent is Allianz SE.

17. Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany that provides asset management services to 82 million clients in over 70 countries. Allianz SE refers to itself and its subsidiaries as the "Allianz Group." According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services." Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision and risk management of the Fund, as marketed and sold to Getty.

18. Allianz SE's corporate filings explain the important role the ultimate parent company—Allianz SE—plays in establishing and enforcing the risk framework and procedures that failed in the case of the Structured Alpha funds. For example, Allianz SE's Board of Directors is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group." Board members of both Allianz SE and the Allianz Group sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines." According to those filings, Allianz Group runs its "operating entities"—including AllianzGI here that is part of the asset management division—"via an integrated management and control process," which includes Allianz Group reviewing the operating entities' "business strategies and goals."

19. Allianz SE acknowledges that it exercises controlling power over AllianzGI and relies on its business activities in assessing its own solvency under applicable European insurance regulations. Specifically, according to Allianz Group's 2019 Solvency and

Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated account and solvency calculation of AllianzGI—confirming the ultimate control Allianz SE exerts over AllianzGI.

## FACTUAL ALLEGATIONS
### A. Background of the Allianz Global Investors Enterprise

20. AllianzGI solicited investments in the Structured Alpha funds based on the proclaimed ability to provide attractive investment opportunities and consistent returns protected by Allianz SE's purportedly sophisticated and "rock-solid risk management." Branded as "Allianz Global Investors"—the marketing name for the Allianz Group's global asset management business—AllianzGI presented itself as a single unitary enterprise, under the leadership of its corporate holding parent Allianz SE, that operated on a coordinated basis throughout the world.

21. As explained in marketing materials on its website and presented to Getty, Allianz Global Investors repeatedly highlighted the benefits of its relationship with Allianz SE and its reputation for superior risk management and track record. For example, Allianz Global Investors claimed that its "ability to manage risk for investors is a direct reflection of our own business" at AllianzGI's parent company—Allianz SE—"where we practice the highest standards of enterprise risk management." Similarly, Allianz Global Investors touted in marketing materials that it is a "globally integrated investment manager" that "has a strong parent with a track record of strategic investment for the long term."

22. Further reinforcing the notion that investors could rely on the "rock-solid risk management" and benefits of that global enterprise, Allianz Global Investors presents its investment performance and assets under management in marketing materials as the combined activities of Allianz. Allianz Global Investors defined itself as a group of entities that "coordinate their research, investment and/or trading activities" qualifying as a "firm" under the Global Investment Performance Standards ("GIPS"), a set of international

standards governing the disclosure and representation of investment performance results. Doing so enabled Allianz Global Investors to advertise to investors that they would benefit from the strength and stability of over 780 investment professionals in 25 offices worldwide and management of over $560 billion in assets. As explained in marketing materials, Allianz Global Investors' "global investment platform brings together professionals from across asset classes and investment styles, enabling them to collaborate to generate unique insights for the benefit of clients while maintaining distinct investment processes."

23. The ability to draw from the experience, risk management expertise and asset base of the global Allianz Global Investment platform and Allianz SE was a core feature of the Structured Alpha funds investment proposition.

24. AllianzGI's SEC filings state that AllianzGI coordinates its activities with the Allianz Global Investors affiliates, each of which is also a directly or indirectly a wholly-owned subsidiary of Allianz SE. For example, those filings explain that AllianzGI shares employees with and provides other services to the Allianz Global Investors affiliates and similarly receives services in return, including in legal and compliance, risk management, human resources, finance, information technology, trade support and sales and marketing.

25. In fact, rather than a mere marketing name, Allianz Global Investors has its own "Global Executive Committee" and "Global Investment Management Committee" and "executive leadership team" that manages and oversee the activities of the Allianz Global Investors entities. Those executives include CEO Tobias Pross and Global Head of Investments at Allianz Global Investors Deborah Zurkow.

26. The actual management and oversight of the Structured Alpha funds followed the unified "global entity" AllianzGI portrayed to investors. The portfolio managers responsible for the Alpha Funds—Greg Tournant, Stephen G. Bond-Nelson, and Trevor L. Taylor—are Managing Directors at AllianzGI. Tournant, in turn, reports to Ms. Zurkow, who is employed by Allianz Global Investors GmbH, UK Branch, an affiliate of AllianzGI. Ms. Zurkow is specifically identified as an "associated person" of AllianzGI under the

Investment Adviser Act of 1940 in AllianzGI's Form ADV filing. Chris Grix, Allianz Global Investors' U.S. Head of Risk, who reports to Wolfram Peters, Allianz Global Investors' Global Head of Risk, were both involved in overseeing the Structured Alpha funds' performance in February and March 2020. And John Viggiano, Managing Director and U.S. General Counsel at Allianz Global Investors, who also served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for Allianz Asset Management GmbH, later communicated with Structured Alpha funds investors about their performance during this time period.

27. Following the disastrous performance of the Structured Alpha funds in February and March of 2020, Allianz Global Investors announced that the CEO of AllianzGI, Douglas Eu, would be leaving the firm on June 30 after 14 years with AllianzGI, including as the U.S. CEO of Allianz Global Investors GmbH. In connection with his departure, Allianz installed Malie Conway, moving her from her role as Chief Investment Officer of Global Fixed Income Strategies in London to be the head of Allianz Global Investors' U.S. distribution operations in New York. She will report to Mr. Pross, the global CEO of Allianz Global Investors in London. AllianzGI disclosed that it will not appoint a new CEO to replace Mr. Eu.

### B.  AllianzGI Markets the Structured Alpha Strategy

28. The Structured Alpha strategy consists of alpha and beta components. The beta component is intended to provide broad market exposure to a particular asset class through investments in financial products (like exchange-traded funds) that replicate the performance of a market index (like the S&P 500). The alpha component is an options trading strategy that AllianzGI claimed would seek "targeted positive return potential" while nonetheless maintaining "structural risk protections."

29. AllianzGI has described Structured Alpha as consisting of an options "overlay" (*i.e.*, the alpha component) designed to exhibit low correlation to the underlying equity or fixed income beta exposure.

30. The options strategy was largely the same regardless of the Structured Alpha fund or its underlying beta(s). Thus, AllianzGI represented the Structured Alpha strategy would "never make a forecast on the direction of equities or volatility."

31. The "building blocks" of AllianzGI's strategy were supposed to be three types of positions: (1) range-bound spreads, (2) directional spreads, and (3) hedging positions.

32. The range-bound spreads, AllianzGI represented, are "short-volatility positions" that are "designed to collect option premium and to generate excess returns in normal market conditions." "Based on detailed, proprietary statistical analysis," AllianzGI explained, "put and call options are sold to create 'profit zones' that have a high probability of success upon expiration of the options." The "profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration." If "the equity index remains inside the profit zone during the life of the option positions, the strategy will profit," according to AllianzGI. AllianzGI claimed these range-bound spreads generated roughly two-thirds of the strategy's returns.

33. The directional spreads, AllianzGI represented, are "long-short volatility positions designed to generate returns when equity indices are rising or falling more than usual over a multi-week period." They "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels." These spreads "are set up to capture larger equity-market movements" and to "act as portfolio diversifiers." AllianzGI claimed they accounted for roughly one-third of the strategy's returns.

34. In presentations about Structured Alpha, AllianzGI depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:



35. AllianzGI represented that the hedging positions would be the third component of Structured Alpha and a "cornerstone" of the strategy. These are "long-volatility positions" that AllianzGI told Getty are "designed to protect the portfolio in the event of a market crash." AllianzGI claimed it would purchase the hedges "out of the money at various levels to the downside, and always in a greater quantity than the amount of puts sold for the range-bound positions." AllianzGI emphasized that the "long puts are in place *at all times*" and "*exclusively* for risk-management purposes."[1]

---

[1] All emphases are added unless otherwise noted.

36. AllianzGI depicted the long-put hedging positions as follows, illustrating (as AllianzGI commonly represented) that it would purchase the hedging positions "-10% to -25%" below the market:



37. AllianzGI also promoted the close relationship with its ultimate corporate parent, Allianz SE, in marketing Structured Alpha. AllianzGI claimed, consistent with the unified risk management framework that Allianz SE touts in its annual reports, that risk was "continuously managed and monitored" at the "firm level." Assisting these risk management efforts, AllianzGI told Getty, was IDS GmbH ("IDS"), a wholly owned subsidiary of Allianz SE, that supposedly provided ongoing risk analysis reports. AllianzGI's direct parent, Allianz Global Investors U.S. Holdings LLC, purportedly oversaw AllianzGI's "day-to-day portfolio management and investment operations," including risk management.

38. When Getty invested in the Fund, it was critically important that Allianz Global Investors offered a strong and stable parent, substantial global resources, strong infrastructure, and independent risk management and oversight of individual strategies. Getty was further comforted by the facts that operations and risk management is provided by Allianz Global Investors, and that an independent subsidiary of Allianz SE provides risk oversight of all asset management groups.

**C. Getty Invests in Structured Alpha Based on AllianzGI's Representations**

39. Relying on AllianzGI's representations about Structured Alpha's "risk-controlled return profile" and its hedges being in place "at all times" to "protect the portfolio in the event of a market crash," Getty invested assets in Structured Alpha.

40. During an introductory meeting on or around July 19, 2016, Jeff Sheran, a Managing Director at AllianzGI, and Joel Damon, a Director at AllianzGI, told Getty that Structured Alpha is designed to generate returns *independent* of markets by buying and selling puts and calls in U.S. equity indices. They further represented that AllianzGI is long and short volatility at all times, but *always non-directional*. They also provided a presentation, which represented that AllianzGI would "[n]ever make a call on the direction of equities or of volatility," and would purchase put options "designed for tail risk protection" as "a key feature of the Strategy's risk management."

41. In due diligence responses dated April 2015 provided to Getty, AllianzGI represented that, "The strategy makes no calls on the direction of equity markets or on implied volatility and takes great care to hedge tail risk." The responses elaborated that, "We do not take a view on the direction of future market condition."

42. Also in the due diligence responses, AllianzGI promised that "long puts are in place at all times, exclusively for risk management purposes. Unless a tail event occurs they will have a negative expected value, but they are a cornerstone of the strategy's investment process." AllianzGI further promised that, "The worse the scenario, typically the greater the profit on that day for the portfolio," and that, "Our tail-risk protection now includes hedging

not only for a single-day market crash, but also for a significant multi-day or multi-week decline."

43. Additionally, AllianzGI recognized its fiduciary responsibilities in these responses: "AllianzGI US has a fiduciary responsibility to seek to achieve a client's stated investment objective by investing the client's assets within the parameters of the client's stated investment guidelines. The client's investment guidelines are an integral component of the client's investment management/sub-advisory agreement."

44. In an October 2016 presentation by Messrs. Tournant and Damon to Getty, AllianzGI represented that it would "[n]ever make a call on the direction of equities or of volatility." The presentation further explained that AllianzGI would "[b]uy put options—in a greater quantity than sold—to protect the portfolio in the event of a market crash/closure." Moreover, the presentation stated that, "These positions are designed for tail risk protection, not for outperformance potential, but are a key feature of the Strategy's risk management."

45. Tail risk hedging using long puts was a particularly important part of the strategy for Getty. The strategy was designed to profit irrespective of the market environment and does not make a call, nor rely upon, the direction of equities or volatility. Getty understood that the Fund's hedging positions would protect the strategy from significant equity market declines and protect from having a margin call in an extreme decline. Getty further understood that these hedging positions are a key feature of preservation of capital and risk management, and would always be long volatility.

46. On October 17, 2016, Getty initially invested $10 million in the Fund. Getty invested additional amounts in the Fund over time, but always with the understanding, based on AllianzGI's ongoing representations, that AllianzGI was employing the same risk-controlled investment strategy it had described.

47. Getty invested in only one Structured Alpha fund: the AllianzGI Structured Alpha 1000 LLC. The Fund's beta component sought to deliver a return equivalent to the BofA Merrill Lynch 3-Month U.S. Treasury Bill Index.

48. The strategy's alpha component was designed to outperform this index. The targeted outperformance for the Fund varied based on the level of the Chicago Board Options Exchange Volatility Index (the "VIX"), an index measuring the market's expectation of volatility, when AllianzGI was building its option positions. The lower the VIX, the lower the excess return AllianzGI was supposed to target.

49. The Fund was organized as a limited liability company of which AllianzGI was the managing member. Getty's investments in the Fund were subject to a collection of agreements that memorialized various duties AllianzGI had undertaken with respect to Getty. These agreements include the Second Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha 1000 LLC, the Third Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha 1000 LLC, and the Fourth Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha 1000 LLC (collectively, the "LLC Agreements"), the AllianzGI Structured Alpha 1000 LLC Confidential Private Placement Memorandum (the "PPM"), and the AllianzGI Structured Alpha 1000 LLC Subscription Agreement (the "Subscription Agreement").

50. Under the PPM, for example, AllianzGI accepted the duties applicable to a fiduciary under ERISA—the highest duties known to the law—whenever the Fund constituted "plan assets" under the statute. On information and belief, the Fund constituted plan assets at all relevant times because a sufficient percentage of the Funds' equity interests were held by benefit plan investors, and AllianzGI executed side letters with a number of these benefit plan investors expressly providing that AllianzGI would be a fiduciary under ERISA. *See Schaefer v. Allianz*, Case No. 20-CV-09587 (KPF) (S.D.N.Y.), ECF No. 4, Complaint ¶¶ 46-47; *Marco Consulting v. Allianz*, Case No. 21-CV-00401 (KPF) (S.D.N.Y.), ECF No. 37, First Amended Complaint ¶ 34; *MTA v. Allianz*, Case No. 20-CV-07842 (S.D.N.Y.), ECF No. 44, Amended Complaint ¶¶ 25-34; *Fairfield v. Allianz*, Case No. 20-CV-05817 (S.D.N.Y.), ECF No. 46, Second Amended Class Action

Complaint ¶¶ 83-87; *Blue Cross Blue Shield NEBC v. Allianz*, Case No. 20-CV-07606, ECF No. 1, Complaint ¶ 53; *Chicago & Vicinity Laborers v. Allianz*, Case No. 20-CV-09478 (KPF) (S.D.N.Y.), ECF No. 1, Complaint ¶¶ 57-61; *Chicago Area I.B. v. Allianz*, Case No. 20-CV-07952 (KPF) (S.D.N.Y.), ECF No. 62, First Amended Complaint ¶¶ 118-20.

51. At all relevant times, then, AllianzGI agreed to be "subject to the obligations and liabilities imposed on fiduciaries by ERISA." Even if the Fund somehow did not constitute plan assets, AllianzGI promised to "use its best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA." AllianzGI owed fiduciary duties of care and loyalty to investors in the Fund regardless of whether they were plans governed by ERISA.

52. Under the LLC Agreements, moreover, AllianzGI accepted appointment as a fiduciary "investment manager of the [Fund]." AllianzGI's responsibilities as investment manager included "advising regarding the purchase and sale of investments," "arranging financing for the acquisition of investments and other assets," "conducting, or supervising third parties who conduct, investigations of investments," and "managing the [Fund's] assets."

53. The LLC Agreements also provide that AllianzGI may be liable to Getty for losses sustained by the Fund or its investors arising from AllianzGI's "bad faith or … willful misconduct or negligence."

54. Further, the PPM provides that, "The assets of the Fund will be invested in accordance with the investment policies and objectives described in" the PPM.

**D. AllianzGI Reiterates Structured Alpha's Risk-Managed Strategy**

55. After Getty's initial investment, AllianzGI constantly reiterated the fundamental elements of the Fund's strategy.

56. In its 4Q16 quarterly update for Getty, AllianzGI repeated that "we are ***nondirectional*** in our views."

57. In its 2Q17 quarterly update for Getty, AllianzGI represented that, "As always, we have no opinion on whether volatility will actually increase in 2017." AllianzGI further represented that, "The ***nondirectional nature*** of our investment process is one of its ***greatest strengths***. As market conditions continue to confound investors, ***our clients can rest assured*** that Structured Alpha 1000's success ***will never be predicated on having to correctly forecast the direction*** of the S&P 500 or the VIX."

58. In a January 2017 presentation, AllianzGI promised that it would "***[n]ever make a forecast on the direction*** of equities or volatility" and would "***[a]lways be a net buyer of put options***, providing protection against a tail event or market crash." AllianzGI summarized the strategy as pursuing "risk-managed returns." On the subject of "Leverage," AllianzGI emphasized that it engaged in "No borrowing." AllianzGI represented that it had "Stop Loss" mechanisms in place. And AllianzGI repeated aspects of its investment philosophy that it claimed to follow, including the mantra "Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses":



59. In the same presentation, AllianzGI also promised that "[r]isk is continuously managed and monitored at both the portfolio level by the investment team and the firm level." AllianzGI claimed to have an "Independent Enterprise Risk Management function responsible for independent portfolio risk oversight monitors *daily* trade activity and *weekly* risk profiles." AllianzGI further represented that it conducted "[r]eal-time risk management and monitoring based on statistical equity index behavior," "[p]roprietary scenario and stress testing models," and "[m]onitoring of bid-ask spreads for options to ensure that our restructuring discipline is executable." These multiple risk management layers were particularly important when Getty decided to invest in the Fund.



## Two pillars of risk management

- Risk is continuously managed and monitored at both the portfolio level by the investment team and the firm level

**Firm-level**

- Evaluates and monitors **portfolio and counterparty risk, business risk, operational risk, and reputational risk**

- **Independent Enterprise Risk Management function** responsible for independent portfolio risk oversight monitors daily trade activity and weekly risk profiles

- **Supported by IDS GmbH - Analysis and Reporting Services (IDS)**, an independent service provider

- **Evaluates:**
  - VaR and expected shortfall
  - 31 stress tests, contribution to risk by index product
  - GARCH estimates of risk
  - Delta, Gamma, and Vega analysis
  - Analysis of performance statistics

**Portfolio-level**

- **Real-time risk management and monitoring** based on statistical equity index behavior

- **Proprietary scenario and stress testing** models

- **Monitoring of bid-ask spreads** for options to ensure that our restructuring discipline is executable

60. AllianzGI repeated these statements numerous times, including in presentations during September 2017, May 2018, October 2018, February 2019, and June 2019.

61. Based on AllianzGI's representations, Getty reasonably understood that AllianzGI was not selling "naked" options, *i.e.*, options without any corresponding hedge in place. Rather, AllianzGI indicated that for every option it sold, AllianzGI bought a corresponding hedge as protection to limit the risk of loss in case the market dropped. AllianzGI led Getty to believe that the hedging positions placed to protect against downside losses would be appropriately matched to the risk-bearing positions and that AllianzGI would never sell any "naked" options. That belief was false.

62. Elsewhere, AllianzGI downplayed the risk of a downturn by explaining that the period of increased volatility that typically accompanies a market downturn would provide an attractive environment in which to deploy its options strategy. It claimed that any short-term underperformance would be recouped in a rebound once the initial downturn had been

weathered. AllianzGI's claim, of course, assumed that the investments would in fact survive the market downturn.

63. AllianzGI also represented that its fee structure would align its interests with Getty's. AllianzGI did not receive a flat asset-based fee to manage the Fund. Instead, it received a performance-based fee, equal to 30% of the Fund's quarterly returns in excess of the benchmark index, but only if those returns exceeded the aggregate amount of any past underperformance from prior periods when compared to the benchmark index. As such, if AllianzGI underperformed, it received nothing—and would have to recover the amount of any underperformance before it could begin receiving fees again.

64. During an on-site visit at AllianzGI on or around January 19, 2017, Mr. Tournant touted the fee structure to Getty, representing that the 0% flat fee and 30% return fee was a huge motivator and works in a big firm like Allianz.

65. Additionally, during a meeting on or around February 5, 2019, AllianzGI touted the fee structure to Getty again, promising that when the Fund generates negative returns, the manager has a strong alignment with the client to recover the high-water mark.

66. As it turned out, the fee structured created the exact opposite incentive when the Fund suffered significant losses in February and March 2020.

**E.  AllianzGI Promises to Deploy a New Hedging Strategy to Further Manage Risk**

67. Structured Alpha underperformed relative to its beta benchmarks in December 2018. Yet those losses were recouped in the ensuing months, as AllianzGI had said could be expected in the event Structured Alpha sustained a loss.

68. In response to the underperformance, AllianzGI vowed to implement a new hedging configuration to better protect the options portfolio and guard against costly restructuring when equity markets experience steep declines.

69. In a "one on one" presentation to Getty on or around February 5, 2019, Messrs. Sheran and Damon previewed a "New Configuration" "of [AllianzGI's] hedging positions" whereby AllianzGI would purchase fewer hedges but buy them closer to the money when

building positions in a low-VIX environment. This new configuration purportedly would require "[s]ignificantly less restructuring" during "times of market stress" and would entail a "[m]ax loss comparable to original-configuration restriction costs."  AllianzGI further explained that the maximum potential loss would be 4% due to the put spread, and assured Getty that the put spread ensures a cap on the losses incurred.

70. In a June 18, 2019 presentation, Messrs. Sheran and Damon elaborated on the new configuration, representing that AllianzGI was "beginning to implement some portfolio refinements that had been in the R&D stage for the past 18 months." These "refinements" "entail[ed] reallocating much of our tail-risk hedge closer to-the-money," which supposedly "create[ed] *self-hedged* range-bound spreads with a *defined maximum loss*."  Thus, rather than restructure short positions, as AllianzGI had at times done when markets fell in the past, AllianzGI claimed that it would "no longer have to restructure:" "These become hands-free spreads that can better allow the index path to play out over the life of the position, with no intervention necessary."

71. AllianzGI included a diagram representing that the "tactical shift" in its hedging positions would create a defined "Max Loss" for the portfolio:



These new "sealed" spreads, AllianzGI claimed, would "[i]mprove[] the portfolio's ability to navigate difficult V-shaped equity and volatility moves" and "[b]etter equip[] the portfolio to handle sharp moves that begin in low-volatility environments." According to AllianzGI, the new configuration was the product of "almost two years" of research and development.

72. In a 3Q19 quarterly update provided to Getty, AllianzGI hailed the new hedging strategy's early successes: "The S&P 500's correction in early August provided a second successful test case, in addition to the May experience, for the new hedging configuration that we began implementing this year." These results demonstrated, according to AllianzGI,

"our improved ability to navigate sharp market declines that are preceded by low-volatility environments."

### F.  AllianzGI Abandons the Risk-Managed Investment Strategy It Had Represented to Getty

73. By at least 2019, on information and belief, AllianzGI had abandoned the investment strategy it professed to follow. On information and belief, rather than "maintain[] the risk profile" it had promised, AllianzGI was taking reckless actions that added excess and undisclosed risk to the portfolio—in effect, leaving the portfolio unhedged in certain market scenarios and placing a directional bet against market volatility—in hopes of chasing additional returns, all unbeknownst to Getty.

74. Juicing the strategy's returns would increase AllianzGI's fees. As noted, AllianzGI did not charge a management fee to operate Structured Alpha. Rather, AllianzGI received 30% of any gains relative to the Fund's benchmark index. If AllianzGI underperformed, it received nothing.

75. On information and belief, one example of AllianzGI's recklessness was its decision to purchase hedging puts further out of the money than AllianzGI had said it would. AllianzGI claimed time and again that its long puts would be struck "-10% to -25%" below the market. When AllianzGI diagramed the hedging component in presentations about Structured Alpha, it depicted a hedge at the bottom end of that range—25% below the market—even in the "original configuration" where (unlike in the "new configuration") the long puts were expected to be further out of the money.

76. In fact, on information and belief, AllianzGI was purchasing hedging puts that were significantly further out of the money than AllianzGI had represented they would be. Those puts were cheaper and therefore less of a drag on the fee-generating returns AllianzGI could hope to produce. By purchasing cheap puts that were far out of the money, AllianzGI could inflate profits from its range-bound and directional spreads, thereby increasing AllianzGI's fees, and still claim that it was buying hedges (though those hedges

had the potential to be virtually worthless in certain market scenarios when they would be most needed). But the gulf between AllianzGI's offensive, premium-generating positions and its defensive ones left the portfolio effectively unhedged and exposed Getty's investments to potential losses far beyond those AllianzGI had presented as possible.

77. On information and belief, another example of AllianzGI's recklessness was its decision to buy hedging puts that expired sooner than the risk-bearing options it sold. AllianzGI had represented that the long puts would be of the same or similar duration as the short puts.

78. In reality, on information and belief, the puts AllianzGI was purchasing as supposed "protection" expired far earlier than many of the puts it was selling, meaning there was, as AllianzGI later admitted, a "duration mismatch" between the options AllianzGI was short and those it was long. AllianzGI bought these shorter-dated puts because, again, they were cheaper. By purchasing less expensive, shorter-dated puts and selling more expensive, longer-dated puts, AllianzGI essentially bought less "protection" than it had promised. Doing so allowed AllianzGI to increase the profits from its range-bound and directional spreads, thereby increasing AllianzGI's fees.

79. Again, AllianzGI departed from the strategy it had represented to Getty and, in doing so, AllianzGI layered excess and undisclosed risk on the portfolio. AllianzGI was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market. That bet left the portfolio exposed to the risk that in a deteriorating market AllianzGI would be unable to backfill the hedges it should have had in place all along.

80. On information and belief, perhaps the most glaring example of AllianzGI's recklessness, however, was its decision not to acquire any hedges for the return-generating options it sold on volatility indexes. In addition to buying and selling options on an equity index like the S&P 500, AllianzGI also disclosed that as part of the Structured Alpha strategy it may buy and sell options on volatility indexes such as the VIX or the iPath Series

B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged. In the same way that AllianGI bought long puts on the S&P 500 to hedge against a decline in the equity markets, it would need long positions on the VIX to hedge properly against a spike in volatility.

81. On information and belief, AllianzGI, however, was taking on the risk of selling VIX options without buying any corresponding hedge. Far from "never" making a forecast on the direction of volatility—a supposed pillar of the Structured Alpha investment philosophy, according to AllianzGI—AllianzGI was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

82. AllianzGI was making that bet despite knowing that the VIX was becoming increasingly sensitive to market movements. In a 4Q19 quarterly update to Getty, AllianzGI claimed that the recent "sensitivity of the VIX" was "advantageous" for Structured Alpha. A "typical response," AllianzGI explained, "is for the VIX to rise 10 to 20 times more than the S&P 500 declines." But in early December 2019, AllianzGI observed a VIX increase "100 times larger than the [S&P 500] index move." Even though AllianzGI had identified that the VIX was becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, on information and below, AllianzGI continued to short volatility options—betting that the VIX would remain relatively low—without any corresponding long positions to hedge against a spike in the VIX.

83. In all cases—whether purchasing puts too far out of the money or purchasing puts with shorter expiration dates than the puts it sold or shorting the VIX without any corresponding hedge in place—AllianzGI's motivation was self-interest, not the benefit of Fund members like Getty. And in all cases, AllianzGI had departed from the prudent strategy it had represented to Getty, adding excess and undisclosed risk out of line with the risk parameters AllianzGI had pledged to follow.

84. Getty did not know that, going into the market dislocation of February and March 2020, AllianzGI had departed from its professed investment strategy and was instead layering excess risk into the Fund. The strategy seemed to have been performing as AllianzGI said it would, with any short-term losses being recovered in subsequent months. And AllianzGI represented that the portfolio was, if anything, better positioned to handle a market downturn than it had been in the past.

85. The most significant modification to the Structured Alpha investment strategy that AllianzGI had brought to Getty's attention was one that purportedly ***enhanced*** the portfolio's ability to navigate a market decline. In its 3Q19 and 4Q19 quarterly updates to Getty, AllianzGI touted its "new configuration" hedges, which AllianzGI said gave the portfolio an "improved ability to navigate sharp market declines that are preceded by low-volatility environments" and "made the option portfolio more resilient." Although it trumpeted this "refinement[]," AllianzGI did not tell Getty of its other changes to Structured Alpha's investment strategy—namely, on information and belief, that it was making a directional bet that volatility would remain low, selling naked options, and buying hedges much further below the market than it should have under its professed investment strategy.

86. These and other reckless actions by AllianzGI would lead Getty to suffer severe investment losses in early 2020.

### G. Getty's 2019 Investment in the Fund

87. In reliance on AllianzGI's ongoing representations about the Structured Alpha strategy, in 2019, Getty invested further in the strategy.

88. More specifically, on April 17, 2019, Mr. Damon solicited an additional investment from Getty in the Fund because AllianzGI purportedly "had some capacity open in our Structure[d] Alpha 500/1000 pool."

89. Mr. Damon failed to disclose the significant changes AllianzGI had made in its Structured Alpha strategy and risk profile, including AllianzGI's decision to make directional bets on the market, which was material as it hid the Fund's increased risk profile from Getty.

90. On April 26, 2019, Getty invested an additional $10 million in the Fund, effective May 1, 2019.

**H. AllianzGI Knowingly or Recklessly Misrepresented and Omitted Material Information Regarding the Fund's Strategy and Risk after March 2019**

91. AllianzGI indicated in early 2019 that it had begun to modify the options strategy in light of the persistently low VIX. Specifically, in the above-referenced February 2019 "one on one" presentation to Getty, AllianzGI disclosed that it was reallocating a large number of its long puts into its sealed range-bound spread positions; in other words, it was buying a much larger percentage of the Fund's long puts closer to the money.

92. Doing so should not have increased risks to the Fund. Indeed, AllianzGI represented that the "[m]ax loss [of the new structure is] comparable to original configuration restructuring costs." It also represented that this modification would result in "[s]ubstantially less realized loss at times of market stress."



93. AllianzGI never disclosed to Getty that, on information and belief, by April 2019, it had actually changed the Fund's strategy to gamble on the market's direction—or that it had shorted volatility. Likewise, AllianzGI never indicated that the Fund's downside risk could be impacted.

94. In fact, even after it had taken its directional bet, AllianzGI continued to falsely represent to Getty that the Fund's options strategy was market-agnostic and designed to profit in the face of market declines.

95. AllianzGI's false statements and omissions altered the core of the Fund's strategy and objectives and, therefore, undercut the rationale for Getty's decision to make

its additional investment in the Fund in 2019 and retain its previous investments in the Fund.

**I.   AllianzGI's False Statements Following Its Undisclosed Directional Bet**

96. In its 1Q19 quarterly update sent to Getty on April 26, 2019 shortly before Getty provided the paperwork for its additional investment, AllianzGI falsely stated that the Fund's options strategy was market agnostic and that it "always construct[s] the option portfolio for multiple scenarios" so that if the market "stayed down or continued lower," AllianzGI expected beneficial behavior for the portfolio. AllianzGI further represented that "[w]hen the VIX is higher at time of position construction, we are able to build range-bound spreads that have increased statistical safety and resilience to begin with," thus suggesting that a higher VIX would be beneficial to the Fund.

97. These representations were false. In fact, on information and belief, by April 2019, the Fund had significantly increased its negative gamma and, therefore, its decline in value would accelerate if the market declined. Thus, the option portfolio was not, in fact, constructed to protect Getty if the market declined. Moreover, the increased negative gamma meant that the Fund was functionally shorting the VIX, and since volatility almost always spikes in connection with a market decline, a higher VIX would be—and ultimately was—disastrous.

**J.   AllianzGI Failed To Disclose That the Fund Was Not Directionally Neutral**

98. AllianzGI also knowingly or recklessly omitted material information in its reports to Getty, which helped conceal from Getty the fact that AllianzGI's strategy had become significantly riskier by April 2019.

99. First, the 1Q19 quarterly update did not indicate in any way that the Fund had functionally shorted volatility. Instead, the update falsely emphasized that the Fund was

constructed for multiple market scenarios, including market decline/high-volatility scenarios.

100.    Second, AllianzGI failed to disclose that the "stop-loss" mechanism it represented could be used as an emergency precaution, could either be disregarded for its own self-interested purpose or had been rendered ineffective by its new undisclosed options strategy.

### K.  AllianzGI Knew or Was Reckless in Not Knowing That Its Representations Were False or Materially Misleading

101.    AllianzGI—including but not limited to Messrs. Tournant, Taylor, and Sheran—knew that its representations in the 1Q19 quarterly update that the Fund was well-hedged for a potential market decline was materially false, because, on information and belief, AllianzGI had intentionally restructured its investment strategy in or around April 2019 so that the Fund would generate higher profits in lower volatility environments and incur losses if the market declined and volatility increased.

102.    Gamma is a basic calculation for options trading, universally used by options traders to help assess risk in a portfolio. Indeed, in the presentations, AllianzGI repeatedly represented that IDS monitored this specific metric. IDS and AllianzGI therefore had undertaken a duty to monitor this data, and either were actually aware of it or were reckless in disregarding their duty to monitor it.

103.    Further, because, on information and belief, its new investment positions nearly quadrupled the negative gamma for the Fund's options portfolios, AllianzGI, including Messrs. Tournant, Taylor, and Sheran, knew or was reckless in not knowing that the portfolios would suffer serious losses in the event of a market downturn with rising volatility.

104.     For the same reason, on information and belief, AllianzGI knew or was reckless in not knowing that its changed investment strategy caused the Fund to have significantly higher downside risk that was much more correlated with market fluctuations than AllianzGI had previously represented.

105.     As described below, on information and belief, in March 2020, Mr. Taylor admitted that Structured Alpha was overall "clearly a short volatility strategy." He thus admitted, on information and belief, that AllianzGI had pursued a strategy directly contrary to its representations to Getty.

106.     As further described below, on information and belief, those involved with managing the Fund at AllianzGI, including Messrs. Tournant, Taylor, and Sheran, also knew that neither AllianzGI nor its affiliates had tested the new undisclosed options strategy for a market decline with high volatility. AllianzGI therefore knew, or was reckless in not knowing, the truth of their representations about the Fund's behavior in a declining, highly volatile market.

107.     Similarly, on information and belief, given its inadequate vetting of its options positions, AllianzGI, including Messrs. Tournant, Taylor, and Sheran, knew or was reckless in not knowing that its advertised risk management and stop-loss procedures might be ineffective or disregarded in the face of market dislocation.

108.     AllianzGI's decision to keep its radical strategic change from Getty was not merely motivated by its desire to retain Getty and boost its management fees. Rather, AllianzGI's new options strategy directly contradicted the raison d'etre of its Structured Alpha strategy—uncorrelated investment returns with robust protections from a market crash—and, therefore, disclosure to anyone would have ensured swift redemptions from investors and demise of the Fund.

109.     Because of all of its prior representations, AllianzGI had a duty to disclose this material change in the Fund's gamma, and therefore its risk profile, to Getty.

**L.  Getty's Reliance on AllianzGI's Representations Was Reasonable**

110.     Because AllianzGI knowingly or recklessly failed to disclose the material facts alleged above, Getty had no means of discovering that, on information and belief, the Fund's options portfolio had become markedly short volatility and was not market agnostic. Getty also could not have known that, on information and belief, the Fund's downside risk and correlation to market fluctuations had increased beyond AllianzGI's prior representations because AllianzGI failed to correct such representations.

111.     AllianzGI intended for Getty to rely on its materially false or misleading communications in making further investment decisions. In fact, Getty did reasonably rely on such communications to its detriment. Had Getty known that the Fund was no longer directionally neutral and was actually short volatility, Getty would have promptly redeemed its investments in the Fund, and it would not have invested an additional $10 million in the Fund in 2019.

112.     Prior to mid-March 2020, Getty had no reason to doubt the veracity of AllianzGI's representations about its investment strategy and the associated risks because when there had previously been significant market sell-offs, the Fund had historically performed in line with AllianzGI's representations.

113.     For example, in the second quarter of 2016, when the markets experienced a massive sell-off and rapid increase in volatility due to Britain's exit from the European Union, the Fund experienced a positive 2.79% return, net of fees.

114.     Similarly, according to AllianzGI, between February 2 and February 9, 2018, the S&P 500 dropped 10.2% and, on February 5, 2018, the VIX increased by 123%— its largest single day percentage move in more than 30 years. Nevertheless, the Fund

experienced a negative return of only 4.64% for the quarter, and AllianzGI bragged that it had "accomplished [its] primary objective, which was to move all our strikes out of the way of the market's descent."

115.    Furthermore, according to the February 2019 "one on one" presentation, the Fund had an Alpha—or excess return relative to its benchmark index—of 7.8% over its lifetime, which was consistent with Getty's expectations of performance and risk.

**M. AllianzGI Admits That It Misrepresented the Fund's Strategy**

116.    On a March 4, 2020 call, Messrs. Sheran and Damon informed Getty that the Fund fell 15% to 20% in February. Yet they reported optimism about the portfolio's ability to rebound, explaining that AllianzGI had structured the portfolio and hoped to be flat by the end of May, then add gains as there were purportedly a lot of good levers at work at that time.

117.    However, on information and belief, AllianzGI later admitted to investors that its prior representations about its investment strategy, the Fund's risk profile, and its risk management system were false.

**1.    AllianzGI Reveals That the Fund Was Structured to Be Short Volatility**

118.    On information and belief, Plaintiff Lehigh University ("Lehigh") in a related case is one such investor to whom AllianzGI revealed the truth. *See Lehigh University v. Allianz*, Case No. 20-CV-07061 (KPF) (S.D.N.Y.), ECF No. 46, First Amended Complaint ("*Lehigh* Compl.") ¶¶ 181-94. On information and belief, Lehigh invested in two of the Structured Alpha funds, the AllianzGI Structured Alpha U.S. Equity 500 LLC (the "U.S. Fund") and the AllianzGI Structured Alpha Global Equity 500 LLC (the "Global Fund"). *Id.* ¶ 1. Because these two funds followed the same investment strategy as the Structured Alpha 1000 Fund in which Getty invested, Getty believes

discovery will show that AllianzGI's admissions about the U.S. Fund and the Global Fund also apply to the Structured Alpha 1000 Fund.

119.    On information and belief, in a series of telephone calls and written disclosures in early March, AllianzGI revealed to Lehigh for the first time the extent to which its modifications to the Structured Alpha strategy had increased investors' risk.

120.    For example, on information and belief, a document titled "Historical Greeks Exposure," produced to Lehigh in March for the first time, provided the historical gamma calculations for the U.S. Fund and the Global Fund. In doing so, AllianzGI disclosed for the first time the significant negative gamma increase in 2019 and that these were much more exposed to directionality than previously represented.

121.    On information and belief, in a March 9, 2020 email, Michele Cameron, AllianzGI's senior relationship manager, confirmed that the U.S. Fund's and the Global Fund's options gamma profile increased as of April 2019 due to a "new directional call program" and an "increase in VIX option positions."

122.    Additionally, on information and belief, on a March 13, 2020 conference call with AllianzGI, Mr. Taylor admitted that the U.S. Fund and the Global Fund were overall "clearly a short volatility strategy."

123.    During this same period, on information and belief, AllianzGI also revealed that it had purchased an inadequate number of put options, and that the strike prices of the put options it did purchase were far below the price range that it had previously represented.

124.    Specifically, on information and belief, in a document titled "AllianzGI US Equity 500 Holdings and Deltas 1/31/2020," which was sent to Lehigh on March 5, 2020, AllianzGI revealed that many of the strike prices for the long puts options it

purchased were well below the -10% to -25% range that Allianz had previously represented in its presentations and purchased in insufficient quantities to provide the meaningful downside protections promised to investors.

        2.      **AllianzGI Admits That the Fund's Downside Risk Was Much Higher Than Previously Reported**

125.      On information and belief, in a March 5, 2020 conference call, AllianzGI informed Lehigh, for the first time, that the U.S. Fund and the Global Fund had a downside risk that substantially exceeded AllianzGI's prior representation that these funds would suffer maximum expected losses of around 8%.

126.      On information and belief, in March, AllianzGI also distributed to Lehigh a Risk Report dated February 28, 2020, which, for the first time, disclosed that the U.S. Fund would lose money in all scenarios where the S&P 500 declined and the VIX increased significantly. This risk applied equally to the Global Fund since it utilized the same options strategy. Likewise, on information and belief, in another document titled "Structured Alpha 500 Risk Scenarios," AllianzGI represented that the U.S. Fund and the Global Fund would yield positive returns ***only*** when the underlying market index remained neutral or increased.

127.      Finally, on information and belief, the February 2020 risk report also disclosed that the U.S. Fund was heavily correlated to movements in the S&P 500 and therefore the U.S. Fund was much more exposed to market fluctuations than AllianzGI had led investors to believe. In previous communications, AllianzGI had represented to Getty that the Structured Alpha 1000 Fund in which Getty had invested would remain largely uncorrelated with its underlying index. Because the U.S. Fund and the 1000 Fund followed the same general strategy, Getty believes that the 1000 Fund was similarly heavily correlated to movements in the underlying index for the 1000 Fund (the BofA Merrill Lynch 3-Month U.S. Treasury Bill Index).

### 3.   AllianzGI Admits that Its Risk Management Was Inadequate

128.     On information and belief, in March 2020, Lehigh also learned that AllianzGI's risk management program was inadequate.

129.     AllianzGI had consistently represented that it had in place robust risk management procedures by which it would, among other things, model the Fund's performance in different market scenarios. Yet, on information and belief, AllianzGI disclosed during the March 5, 2020 call with Lehigh that it had never conducted any stress tests for a multi-day market decline comparable to what occurred in February and March 2020. AllianzGI therefore did not know and could not prepare for the fact that its investment positions were inadequate to protect investors.

130.     In short, despite years of assurances to the contrary, AllianzGI was completely unprepared for a serious market dislocation. On information and belief, not only had AllianzGI removed or impaired the downside protections in its investment positions, its stress tests and modeling ignored the possibility that the market could experience a steep multi-day drop—hardly an unforeseeable circumstance.

### N.  Allianz's Breaches Cause Getty's Investments Severe Losses

131.     Going into the market turmoil of February and March 2020, in its 4Q19 quarterly update, AllianzGI had told Getty that AllianzGI was "as prepared as ever in the event of a severe market dislocation." Yet, on information on belief, AllianzGI did not have in place appropriate hedging positions to protect the portfolio (as it claimed it would) and then it sold many of the hedges it did have (as it claimed it would not do).

132.     Throughout January and into late February 2020, the VIX remained relatively low and the S&P 500 remained relatively stable before the market began to decline and volatility spiked in the second half of February and March 2020:





133.    As noted above, on a March 4, 2020 call, Messrs. Sheran and Damon informed Getty that the Fund fell 15% to 20% in February. Yet they reported optimism about the portfolio's ability to rebound, explaining that AllianzGI had structured the portfolio and hoped to be flat by the end of May, then add gains as there were purportedly a lot of good levers at work at that time.

134.    Contrary to the rosy picture AllianzGI was painting, Getty's investments were plummeting. As AllianzGI later admitted on a May 5, 2020 call with Getty, the S&P 500 fell 12%—while the Fund was down 58%—on March 16, 2020.

135.    On information and belief, Plaintiff Blue Cross and Blue Shield Association ("BCBS Association") in a related case is another investor to whom AllianzGI revealed the truth. *See Blue Cross and Blue Shield Association v. Allianz*, Case No. 20-CV-10848 (KPF) (S.D.N.Y.), ECF No. 1, Complaint ("*BCBS Association* Compl.") ¶¶ 74-85. On information and belief, BCBS Association invested in the US Fixed Income Series of the AllianzGI Structured Alpha Multi-Beta Series LLC I fund (the "Multi-Beta Series Fund"). *Id.* ¶ 5. Because this fund followed the same investment strategy as the Structured Alpha 1000 Fund in which Getty invested, Getty believes discovery will show that

AllianzGI's admissions about the Multi-Beta Series Fund also apply to the Structured Alpha 1000 Fund.

136.     On information and belief, on March 12, AllianzGI reported on a phone call with investment staff at BCBS Association that the hedges—the "protection" that AllianzGI had said would be in place "at all times" to safeguard the portfolio—were "not working." On information and belief, AllianzGI also reported that the investments would soon face a margin call, the very risk against which the Structured Alpha strategy was to protect.

137.     On information and belief, the next morning, Friday, March 13, AllianzGI emailed Aon Investments USA Inc. ("Aon"),[2] a fiduciary investment adviser to an independent committee of BCBS Association, with additional details about the strategy's collapse. On information and belief, those details revealed that AllianzGI had added excess and undisclosed risk to the portfolio in February and March 2020 and that it had been making other reckless decisions, unbeknownst to BCBS Association, for some time.

138.     If AllianzGI had been managing the portfolio in the manner it claimed it would, AllianzGI would have (among other things) constructed the hedging positions closer to the market and left those hedges in place to secure a defined "Max Loss" if the market declined. That was the "new configuration" strategy—touted as the product of "almost two years" of research and development—that AllianzGI had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020.

139.     Yet, on information and belief, as AllianzGI acknowledged in its March 13 email, it had sold the new-configuration hedges—*i.e.*, the hedges that were supposed to be "hands-free" and locked in to contain potential losses. On information and belief, according to AllianzGI, it had struck the puts "7% to 9%" out of the money. But on information and belief, when the market declined, these "new-configuration puts were

_____

[2] At the time, Aon was known as Aon Hewitt Investment Consulting, Inc.

shifted," meaning AllianzGI sold them and replaced them with long puts much further out of the money. On information and belief, AllianzGI, as Aon later put it, chose not to "accept modest losses and aim to recover in a reasonable time period," opting instead to gamble that the market would rebound immediately and "expos[ing] the portfolio to further downside risk." "In hindsight," AllianzGI admitted on information and belief, "**we should have left those positions as is**."

140.   AllianzGI would not have sold the new-configuration hedges were it acting for the benefit of Fund members such as Getty. Were it doing so, it would have accepted modest losses. Instead, on information and belief, motivated by the fact that it would earn no compensation until those losses were recovered, AllianzGI removed the hedge that was supposed to protect Getty's investments and gambled (with Getty's money) that markets would soon recover. In doing so, AllianzGI abandoned not only Structured Alpha's supposed hedging strategy but also its purported tenet not to bet on the direction of the market.

141.   AllianzGI's actions were directly contrary to how it had advertised its fee structure to Getty. As noted above, AllianzGI had represented that its fee structure was a huge motivator and created a strong alignment with investors.

142.   On information and belief, as AllianzGI acknowledged in its March 13 email, these active management decisions also created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses. On information and belief, AllianzGI explained this mismatch meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire, and that the resulting "theta decay reduced their value," and the puts "did not pay out." On information and belief, another problem was that the cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked. On information and belief, AllianzGI wrote, "We are continually rolling into new long puts as they expire," "but there still is a duration mismatch

that causes a continued equity decline / vol increase to hurt the mark and vice versa." On information and belief, had AllianzGI purchased and maintained the proper downside protection that it had represented would be in place at all times, it would have had no need to replace expiring long puts at the critical time when, as Aon later put it, they became "prohibitively expensive."

143.     On information and belief, in addition to what AllianzGI admitted to in its March 13 email, at least two other reckless decisions by AllianzGI inserted excessive risk into the portfolio and contributed to the collapse of Getty's investments.

144.     First, on information and belief, AllianzGI had been chasing additional returns by purchasing cheap long puts much further out of the money than AllianzGI had represented. On information and belief, many of those long puts, Aon reported after the fact, "expired worthless in early March." On information and belief, as Aon explained when asked later why the hedges proved ineffective, "they were too far 'out of the money' to begin with."

145.     Second, on information and belief, though AllianzGI was selling puts and calls on volatility indexes like the VIX, AllianzGI had purchased **no** long positions on the volatility indexes it was shorting. On information and belief, AllianzGI left the portfolio at the mercy of a surge in volatility, which is exactly what happened in February and March 2020.

146.     On information and belief, AllianzGI left these short positions "naked" even though it knew that the VIX had been displaying increased "sensitivity" to market moves and was therefore prone to sudden, larger-than-anticipated spikes. On information and belief, the net result was that the portfolio, going into the volatility spikes of February and March 2020, was ***short*** volatility—reflecting AllianzGI's gamble that the VIX would remain relatively low. On information and belief, AllianzGI made this careless directional

bet despite the supposed pillar of its investment strategy that it would "never make a forecast on the direction of equities or volatility."

147.    The combination of these and other reckless actions by AllianzGI caused Getty's investments in the Fund to suffer significant losses by the time the market opened on Monday, March 16. On information and belief, AllianzGI notified investment staff at BCBS Association that the portfolio was facing a margin call the next day.

148.    Accordingly, there was no choice but to liquidate the investments to protect what was left. On or around March 25, 2020, Allianz announced during a quarterly group call with investors that it would liquidate the Fund.

149.    On or around March 27, 2020, research firm Albourne provided a report on the Structured Alpha strategy to Getty. The report recounts a phone call between Mr. Sheran and Michael Ide of Albourne, where Mr. Sheran admitted that, in late February, AllianzGI "monetiz[ed] a portion of its long puts to offset losses and restructur[ed] the book so that their new puts (both long and short) were further out of the money." Albourne explained that this strategy left the portfolio "exposed to continuing losses in March" and "implicitly assumed that the most violent part of the correction could last a week or so, but that markets would recover or enter a moderate volatility bear market." This report confirms that Allianz, desperate to recover its losses, had changed its strategy—unbeknownst to Getty.

150.    AllianzGI lost about $71 million of Getty's money—roughly 97% the value of its investments—in a matter of weeks. These losses far exceed those incurred by the Fund's fixed income benchmark index, the bond markets more generally, and comparable investment strategies in which Getty could have invested.

### O. Allianz Attempts to Whitewash Its Breaches

151.    On July 20, 2020, AllianzGI published on its website the results of an internal review AllianzGI claims to have conducted into the "substantial losses" Structured Alpha incurred. The stated purpose of AllianzGI's review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

152.    AllianzGI's account purports to describe certain of its actions in March 2020. "During the eleven trading days between March 2 and March 16," AllianzGI says, "there were at least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held." "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices. An analogous process occurred for short VXX calls," according to AllianzGI. But "commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

153.    These details confirm that AllianzGI was betting on a market rebound by continuing to relayer short positions during the critical time period when AllianzGI should have been mitigating risk, not compounding it. What is new in this account, however, is AllianzGI's admission that it was relayering risk-bearing positions all the way until March 12. Only then did AllianzGI stop exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline.

154.    AllianzGI claims in its July 2020 report that it was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash." But AllianzGI was not obligated to layer additional risk into the portfolio so it could bet on

a market rebound. AllianzGI could have, for example, converted to cash or cash equivalents (as it had discretion to do under the PPM), an especially appropriate action to assist in the preservation of capital on a temporary basis.

155.    The most jarring aspect of AllianzGI's July 2020 report is how dramatically the strategy AllianzGI now describes differs from the strategy it had represented to Getty all along.

156.    AllianzGI's report claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss." That assertion contradicts AllianzGI's prior representations of how it would manage the portfolio to avoid significant losses.

157.    AllianzGI's report also claims that the hedges were designed to offer only "some protection" in the event of a market crash. The hedges, AllianzGI now insists, were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time." Rather, they were "deliberately constructed with options that were both of relatively short expiration and far out of the money" only to "protect against a ***one-day market shock***."

158.    AllianzGI never disclosed these limitations. To the contrary, AllianzGI characterized the hedges as "protection" that would be "in place at all times" in order to "protect the portfolio in the event of a market crash." It emphasized that its investment strategy addressed "two risks: the overnight market crash ***and the multi-week market correction***." AllianzGI's "tail-risk protection," it told investors, "includes hedging ***not only for a single-day market crash, but also for a significant multi-day or multi-week decline***." AllianzGI bolstered these claims about protection against multi-week declines with stress testing purporting to show, for instance, that the strategy would yield positive returns during market shocks that took weeks or even months to transpire. AllianzGI's after-the-

fact description of the hedges as a partial backstop—protecting only against a "one-day market shock" but nothing else—is inconsistent with its prior representations.

159.    AllianzGI's July 2020 report claims that because the hedges were constructed to protect only "against a one-day market shock," AllianzGI properly "mitigated" portfolio risk through restructuring.

160.    Yet AllianzGI had told Getty that when it was building positions in a low-VIX environment (like that which existed at the start of 2020), the new-configuration hedges not only would protect against a market decline but would predefine a set "maximum loss." According to AllianzGI, these new-configuration hedges were supposed to create "hands-free spreads" that would need *no restructuring* during "the life of the position." AllianzGI's July postmortem omits any mention of the new-configuration hedges that should have been locked in place to define a "Max Loss."

161.    AllianzGI's July 2020 report claims further that AllianzGI's "Enterprise Risk Management function" stress tested the portfolio against "*single day* scenarios" only.

162.    If single-day stress testing were all AllianzGI was doing, its negligence speaks for itself: such testing would not permit AllianzGI to evaluate, let alone manage, risk in a multi-day or multi-week market decline. Contrary to AllianzGI's July 2020 report, AllianzGI had previously assured that the same "Enterprise Risk Management" team was responsible for "weekly risk profiles" and that AllianzGI's "proprietary tools and models" enabled it to "stress-test the entire portfolio for *any* market scenario"—models AllianzGI claimed were "integral to the successful day-to-day management of Structured Alpha." Again, AllianzGI's postmortem is inconsistent with the risk profile of Structured Alpha that AllianzGI disclosed to Getty.

163.     AllianzGI also included in its July 2020 report a graph providing a "representative depiction of a portion of the composition" of the Fund as of "February 2020":




164.     This graph depicts an investment strategy that is inconsistent with the one AllianzGI assured Getty it would follow to pursue "risk-controlled returns." AllianzGI never disclosed this graph—or anything like it—to Getty before Structured Alpha's disastrous results in 2020. If it had, Getty would not have maintained its significant investments in Structured Alpha.

165.     AllianzGI's July 2020 graph illustrates that AllianzGI bought downside hedges well beneath the strike price at which it said it would buy hedges (*i.e.*, "-10% to -25%" below the market). While AllianzGI inexplicably claims this was "deliberate[]," its failure to buy the hedges it promised added excess risk to the portfolio, leaving the Fund exposed to the severe losses that occurred in February and March 2020.

166.     AllianzGI's July 2020 graph also illustrates the absence of any new-configuration hedges, *i.e.*, the hedges that AllianzGI said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline. These are nowhere

to be found in AllianzGI's graph (just as all discussion of them is missing from AllianzGI's commentary), although AllianzGI had said it had "successful[ly]" deployed this "refinement" to its investment strategy to make the portfolio "more resilient" to market declines.

167.     AllianzGI's July 2020 graph also shows that potential returns from the options strategy (illustrated in blue in the annotated version of AllianzGI's graph below) came at the cost of potentially massive, unhedged losses (illustrated in red below) if the market declined. The downside exposure depicted in AllianzGI's July 2020 chart is contrary to AllianzGI's description of Structured Alpha's investment strategy to Getty, including its representation that the hedging positions protected against sharp market declines.



168.     Importantly, AllianzGI's graph depicts only equity index options on the S&P 500. In its July 2020 report, AllianzGI chose not to illustrate the strategy "payoffs"

from the short volatility options it sold on the VIX and VXX in violation of its promise "never" to make a bet on the direction of volatility. On information and belief, had it included a graph of that strategy, it would have shown the potential for limited, modest payoffs if AllianzGI bet correctly and **unlimited** losses if it did not. AllianzGI has offered no explanation for why it made that wager with Getty's money or how the disastrous losses it caused as a result were consistent with the "risk-controlled" investment strategy AllianzGI claimed to pursue.

### COUNT I: BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)

169.    Getty restates and realleges paragraphs 1 to 168 as though fully set forth herein.

170.    AllianzGI, a registered investment adviser under the Investment Advisers Act of 1940, served as managing member and investment manager of the Fund, a Delaware limited liability company. Allianz was responsible for the general management of the investment portfolios of the Fund.

171.    A fiduciary relationship therefore arose between Allianz and Getty—an investor in and member of the Fund—such that Allianz owed fiduciary duties of care and loyalty to Getty.

172.    AllianzGI also agreed to act as a fiduciary. In the PPM, for example, AllianzGI promised to be "subject to the obligations and liabilities imposed on fiduciaries by ERISA," including duties of care and loyalty, if the Fund was treated as "plan assets" under the statute. Even if it was not, AllianzGI pledged to "use its best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA."

173.    Allianz's fiduciary duty of care required it to discharge its responsibilities managing the Fund with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims.

174.    Allianz's fiduciary duty of loyalty required it to discharge its responsibilities managing the Fund with utmost good faith and for the benefit of Getty.

175.    Getty reposed trust and confidence in Allianz to serve prudently and in good faith as managing member and investment manager of the Fund, which trust and confidence Allianz accepted.

176.    AllianzGI breached its fiduciary duties. AllianzGI's breaches include, without limitation, the following:

    a.    AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it did not put the appropriate hedges in place to protect Getty's investments during a market decline. This failure added excess and undisclosed risk and was contrary to the representations AllianzGI had made to Getty and others that the hedges would be in place "at all times" as "protection" for the portfolio.

    b.    AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed Getty's investments to further downside risk and were contrary to AllianzGI's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard Getty's investments.

c.  AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed Getty's investments to unlimited losses.

d.  AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it either failed to have adequate risk management measures in place or abandoned such measures.

e.  AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when, unbeknownst to Getty, AllianzGI decided to purchase puts that were further out of the money than the maximum range AllianzGI had disclosed, thus adding excess and undisclosed risk to Getty's investments, in an apparent effort to increase AllianzGI's fees.

f.  AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when, unbeknownst to Getty, AllianzGI decided to purchase puts that expired sooner than the puts it sold. This practice was contrary to AllianzGI's representations that the short and long positions would be of relatively equal duration, and it added excess and undisclosed risk to Getty's investments. AllianzGI created this "duration mismatch" not for the benefit of Getty, but because doing so allowed AllianzGI to enhance its fees.

g.  AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when, unbeknownst to Getty,

AllianzGI decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to Getty's investments, again in an apparent effort to enhance its fees.

h.   AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it caused Getty to believe that Structured Alpha's risk profile was consistent with AllianzGI's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how AllianzGI was actually managing the strategy.

i.   AllianzGI breached its duties to prudently manage the Fund or manage it in good faith and for the benefit of Getty when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to Getty's investments.

177.   Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

178.   By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

179.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

180.     As a direct and proximate result of Allianz's breaches of fiduciary duty, Getty sustained actual damages, with the exact amount to be proven at trial.

**COUNT II: BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)**

181.     Getty restates and realleges paragraphs 1 to 180 as though fully set forth herein.

182.     Getty's investments in the Fund were subject to the PPM, the LLC Agreements, and the Subscription Agreement (collectively, the "Fund Agreements").

183.     Getty and AllianzGI are parties to the Fund Agreements.

184.     The Fund Agreements are valid and enforceable contracts.

185.     Getty has performed its obligations under the Fund Agreements.

186.     Under the Fund Agreements, AllianzGI promised, among other things, to comply with "the obligations and liabilities imposed on fiduciaries by ERISA," including the duties of care and loyalty. In this regard, AllianzGI agreed to manage the Fund prudently and for the benefit of Getty.

187.     By executing the Fund Agreements, AllianzGI agreed further to maintain "structural risk protections" in the Fund to safeguard Getty's assets.

188.     In addition, AllianzGI promised under the Fund Agreements to give notice to Getty of any amendments to the LLC Agreements that reasonably could be expected to have a material adverse effect on the Fund or Getty.

189.     Further, the PPM provides that, "The assets of the Fund will be invested in accordance with the investment policies and objectives described in" the PPM.

190.     AllianzGI breached its obligations under the Fund Agreements. AllianzGI's breaches include, without limitation, the following:

a.   AllianzGI breached its contractual duties to Getty when it did not put the appropriate hedges in place to protect Getty's investments during a market decline. This failure added excess and undisclosed risk and was contrary to the representations AllianzGI had made to Getty and others that the hedges would be in place "at all times" as "protection" for the portfolio.

b.   AllianzGI breached its contractual duties to Getty when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed Getty's investments to further downside risk and were contrary to AllianzGI's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard Getty's investments.

c.   AllianzGI breached its contractual duties to Getty when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed Getty's investments to unlimited losses.

d.   AllianzGI breached its contractual duties to Getty when it either failed to have adequate risk management measures in place or abandoned such measures.

e.   AllianzGI breached its contractual duties to Getty when, unbeknownst to Getty, AllianzGI decided to purchase puts that were further out of the

money than the maximum range AllianzGI had disclosed, thus adding excess and undisclosed risk to Getty's investments, in an apparent effort to increase AllianzGI's fees.

f.   AllianzGI breached its contractual duties to Getty when, unbeknownst to Getty, AllianzGI decided to purchase puts that expired sooner than the puts it sold. This practice was contrary to AllianzGI's representations that the short and long positions would be of relatively equal duration, and it added excess and undisclosed risk to Getty's investments. AllianzGI created this "duration mismatch" not for the benefit of Getty, but because doing so allowed AllianzGI to enhance its fees.

g.   AllianzGI breached its contractual duties to Getty when, unbeknownst to Getty, AllianzGI decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to Getty's investments, again in an apparent effort to enhance its fees.

h.   AllianzGI breached its contractual duties to Getty when it caused Getty to believe that Structured Alpha's risk profile was consistent with AllianzGI's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how AllianzGI was actually managing the strategy.

i.   AllianzGI breached its contractual duties to Getty when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks Getty's investments.

     j.   AllianzGI breached its contractual duties to Getty when it failed to have or maintain structural risk protections in place and failed to purchase and maintain hedges that would afford such protection to the portfolio.

     k.   AllianzGI breached its contractual duties to Getty when it altered the Fund's investment strategy to add excess and undisclosed risk without advance notice to Getty.

191.    The Fund Agreements provide that AllianzGI may be liable to Getty for losses sustained by the Fund or its investors "arising from" AllianzGI's "bad faith, willful misconduct or negligence." Allianz's mismanagement of the Fund was at least negligent.

192.    Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

193.    By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

194.    AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

195.    As a direct and proximate result of Allianz's breaches of the Fund Agreements, Getty sustained actual damages, with the exact amount to be proven at trial.

## COUNT III: NEGLIGENCE (AGAINST ALL DEFENDANTS)

196.     Getty restates and realleges paragraphs 1 to 195 as though fully set forth herein.

197.     AllianzGI, a registered investment adviser under the Investment Advisers Act of 1940, served as managing member and investment manager of the Fund, a Delaware limited liability company. Allianz was responsible for the general management of the investment portfolios of the Fund.

198.     Getty was an investor in and member of the Fund.

199.     Allianz therefore owed a duty of care to Getty. That duty required Allianz to discharge its responsibilities managing the Fund with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

200.     In addition, the Fund Agreements provide that AllianzGI may be liable to Getty for losses sustained by the Fund or its investors "arising from" AllianzGI's "bad faith, willful misconduct or negligence."

201.     AllianzGI breached its duty to Getty to exercise reasonable care in managing Getty's investments in the Fund. AllianzGI's breaches include, without limitation, the following:

> a.   AllianzGI breached its duty of reasonable care when it did not put the appropriate hedges in place to protect Getty's investments during a market decline. This failure added excess and undisclosed risk and was contrary to the representations AllianzGI had made to Getty and others

that the hedges would be in place "at all times" as "protection" for the portfolio.

b. AllianzGI breached its duty of reasonable care when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed Getty's investments to further downside risk and were contrary to AllianzGI's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard Getty's investments.

c. AllianzGI breached its duty of reasonable care when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed Getty's investments to unlimited losses.

d. AllianzGI breached its duty of reasonable care when it either failed to have adequate risk management measures in place or abandoned such measures.

e. AllianzGI breached its duty of reasonable care when, unbeknownst to Getty, AllianzGI decided to purchase puts that were further out of the money than the maximum range AllianzGI had disclosed, thus adding excess and undisclosed risk to Getty's investments, in an apparent effort to increase AllianzGI's fees.

f. AllianzGI breached its duty of reasonable care when, unbeknownst to Getty, AllianzGI decided to purchase puts that expired sooner than the puts it sold. This practice was contrary to AllianzGI's representations that the short and long positions would be of relatively equal duration,

and it added excess and undisclosed risk to Getty's investments. AllianzGI created this "duration mismatch" not for the benefit of Getty, but because doing so allowed AllianzGI to enhance its fees.

g.  AllianzGI breached its duty of reasonable care when, unbeknownst to Getty, AllianzGI decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to Getty's investments, again in an apparent effort to enhance its fees.

h.  AllianzGI breached its duty of reasonable care when it caused Getty to believe that Structured Alpha's risk profile was consistent with AllianzGI's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how AllianzGI was actually managing the strategy.

i.  Allianz breached its duty of reasonable care when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to Getty's investments.

202.    Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

203.     By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

204.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

205.     As a direct and proximate result of Allianz's negligence, Getty sustained actual damages, with the exact amount to be proven at trial.

**COUNT IV: VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALLIANZGI)**

206.     Getty restates and realleges paragraphs 1 to 205 as though fully set forth herein.

207.     AllianzGI, by use of the instrumentalities of interstate commerce, intentionally and/or recklessly: employed a device, scheme, or artifice to defraud Getty into investing in the Fund; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading and/or engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Getty in connection with Getty's purchase of shares in the Fund, which constitute securities pursuant to 15 U.S.C. § 77b(a)(1), in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

208.     AllianzGI engaged in fraudulent and deceitful acts or practices by knowingly and intentionally making materially false representations, including, but not limited to, its representations in the 1Q19 quarterly report that the Fund was market agnostic and designed to profit in any volatility environment. In fact, AllianzGI knew, at the time it made such statements, that the Fund was short volatility and would not profit in a

declining stock market with high volatility, because by at least April 2019, it had knowingly and intentionally restructured its investment strategy to bet on market stability and, thus, short volatility, as reflected by the fact that the gamma for the portfolios had nearly quadrupled. Such strategic positioning ensured that the Fund, contrary to AllianzGI's representations, would lose value in a declining stock market.

209.     AllianzGI also intentionally or recklessly failed to disclose numerous material facts, the omission of which rendered AllianzGI's prior representations false and misleading. This includes, but not is not limited to:

a. <u>Directional Bet</u>. AllianzGI knowingly failed to disclose that it had restructured the Fund to bet on market directionality by April 2019. AllianzGI also had a duty to monitor the Fund's gamma risk as investment manager; it therefore knowingly or recklessly failed to disclose to Getty that the negative gamma values for the Fund had increased substantially as a result of its change in strategy. In failing to make these material disclosures, AllianzGI intentionally or recklessly concealed from Getty that the Fund was no longer market agnostic, in direct contravention of AllianzGI's express and repeated representations.

b. <u>Put Options</u>. AllianzGI knowingly failed to disclose that it had purchased an inadequate number of put options and that the strike prices of a significant number of put options it did purchase were far below the price range it had previously represented to Getty in numerous presentations. This resulted in the Fund having far less downside protection than AllianzGI had consistently represented.

c. <u>Risk Exposure</u>. AllianzGI was responsible for monitoring the Fund's risk exposure as their investment manager, and AllianzGI therefore knowingly or recklessly failed to disclose to Getty that, as a result of its

covert change in strategy (i) the Fund's downside risk vastly exceeded the risks set forth in its presentations and (ii) the Fund was highly correlated to movements in their respective market indexes, which rendered them much more exposed to market fluctuations than AllianzGI had led Getty to believe.

d.  Risk Management. AllianzGI knowingly failed to disclose that it never conducted stress tests for a multi-day market decline, which contradicts its repeated representations that it had robust risk management procedures (i) to provide for the "analysis of statistically significant equity-market scenarios" and (ii) to provide "monitoring based on statistical equity index behavior."

210.    AllianzGI had a duty to disclose these material omissions, because AllianzGI owed Getty duties of care and loyalty as the Managing Member and investment manager of the Fund, which was the fund in which Getty invested as a Non-Managing Member. Throughout their multi-year relationship, Getty reposed trust in AllianzGI and AllianzGI accepted that trust, forming a fiduciary relationship, which required AllianzGI to make truthful disclosures of material information. Additionally, disclosure was required to correct AllianzGI's misleading statements, and because AllianzGI had unique access to the withheld information.

211.    Not only did AllianzGI knowingly withhold key information and thereby engage in conscious misbehavior, AllianzGI had the motive to do so, because its undisclosed new investment strategy generated higher incentive fees for AllianzGI.

212.    AllianzGI also had the motive to keep its new strategy secret, because the strategy directly contradicted its long-standing representations to Getty and other structured Alpha investors about the low-risk nature of the Fund. AllianzGI knew that its

failure to adhere to the Fund's mandate would likely result in mass investor redemptions, and therefore intentionally concealed its change in strategy.

213.    AllianzGI made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Getty, in reliance thereon, to make an additional investment in the Fund after March 2019, from which AllianzGI could earn additional incentive management fees.

214.    Getty reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, in deciding to purchase an additional investment in the Fund. Getty could not have known that AllianzGI's representations were false or misleading until the Fund collapsed in the face of the 2020 market crash, because AllianzGI concealed material information.

215.    Had Getty known that the information it received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Getty would not have made an investment in the Fund on May 1, 2019 in the amount of $10 million.

216.    AllianzGI's misrepresentations and omissions directly and proximately caused Getty's losses. As described above, and as evidenced by the Fund's severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Getty's losses—and not the market decline in February and March 2020.

217.    As a direct and proximate result of AllianzGI's material misrepresentations and omissions, Getty has lost a substantial portion of its investment in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

## COUNT V: VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT (AGAINST ALLIANZ SE)

218.     Getty restates and realleges paragraphs 1 to 217 as though fully set forth herein.

219.     At all relevant times, Allianz SE owned and controlled AllianzGI, as fully alleged above. Among other things, Allianz SE, as the parent company of the Allianz Group, marketed itself as an integrated financial conglomerate and was responsible for: (a) setting the business objectives and strategic direction for AllianzGI; (b) setting the risk management framework for AllianzGI; and (c) oversight of AllianzGI's research, investment, and trading activities.

220.     Allianz SE culpably participated in AllianzGI's violations of Section 10(b) and Rule 10b-5. Among other things, Allianz SE knew or should have known that AllianzGI made material statements and omissions to Getty and that AllianzGI altered its investment strategy, was no longer market agnostic or adequately hedged in the manner AllianzGI had presented, and failed to conduct adequate stress tests or provide adequate risk reports to investors like Getty.

221.     Allianz SE had the opportunity and ability to quash the fraud by disclosing the material misrepresentations and omissions by AllianzGI.

222.     Allianz SE had the ability to supervise and control the activities of AllianzGI, did in fact exercise such control, culpably participated in the violations of Section 10(b) and Rule 10b-5 alleged herein, and was therefore a controlling person of AllianzGI and within the meaning of Section 20(a) of the Exchange Act.

223.     As a direct and proximate result of Allianz SE's misconduct, Getty lost a substantial portion of its investments in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

**COUNT VI: COMMON LAW FRAUD (AGAINST ALL DEFENDANTS)**

224.     Getty restates and realleges paragraphs 1 to 223 as though fully set forth herein.

225.     AllianzGI intentionally or recklessly made false statements or omitted to disclose material facts, including, but not limited to, those described above.

226.     AllianzGI made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Getty, in reliance thereon, to retain its investments in the Fund as of March 2019 and to make an additional investment in the Fund thereafter, from which AllianzGI could earn additional incentive management fees.

227.     Getty reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, and the information provided by IDS through AllianzGI in deciding to retain its investments in the Fund as of March 2019 and to make an additional investment in the Fund thereafter. Getty could not have known that AllianzGI's representations were false or misleading until the Fund collapsed in the face of the 2020 market downturn, because AllianzGI concealed material information.

228.     Had Getty known that that the information they received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Getty would have redeemed its investments in the Fund at that time, and would not have invested an additional $10 million in the Fund on May 1, 2019.

229.     AllianzGI's misrepresentations and omissions directly and proximately caused Getty's losses. As described above, and as evidenced by the Fund's severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Getty's losses—and not the market decline in February and March 2020.

230.     Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

231.     By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

232.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

233.     As a direct and proximate result of Allianz's material misrepresentations or omissions, Getty has lost a substantial portion of its investment in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

**COUNT VII: NEGLIGENT MISREPRESENTATION (AGAINST ALL DEFENDANTS)**

234.     Getty restates and realleges paragraphs 1 to 233 as though fully set forth herein.

235.     Allianz owed Getty duties of care and loyalty, because AllianzGI is the Managing Member and investment manager of the Fund, which was the fund in which Getty invested as a Non-Managing Member. Throughout their multi-year relationship, Getty reposed trust in Allianz and Allianz accepted that trust, forming a fiduciary relationship.

236.     AllianzGI acted negligently and carelessly in making the material misrepresentations and omissions, as fully described above.

237.     AllianzGI made these material misrepresentations and omissions knowing that Getty would use and rely upon them in deciding whether to retain its investment in the Fund as of March 2019 and to make an additional investment in the Fund thereafter.

238.     Getty reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, in deciding to retain its existing investments in the Fund as of March 2019 and to make an additional investment in the Fund thereafter. Getty could not have known that AllianzGI's representations were false or misleading until the Fund collapsed in the face of the 2020 market crash, because AllianzGI concealed material information.

239.     Had Getty known that the information it received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Getty would have redeemed its investments in the Fund at that time, and would not have invested an additional $10 million in the Fund on May 1, 2019.

240.     AllianzGI's misrepresentations and omissions directly and proximately caused Getty's losses. As described above, and as evidenced by the Fund's severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Getty's losses—and not the market decline in February and March 2020.

241.     Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

242.     By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

243.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

244.     As a direct and proximate result of Allianz's material misrepresentations or omissions, Getty has lost a substantial portion of its investment in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

## COUNT VIII: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST ALL DEFENDANTS)

245.     Getty restates and realleges paragraphs 1 to 244 as though fully set forth herein.

246.     In the alternative to breach of contract, Allianz is liable to Getty for breach of the implied covenant of good faith and fair dealing.

247.     Getty and AllianzGI are parties to the Fund Agreements.

248.     The Fund Agreements are valid and enforceable contracts.

249.     Getty has performed its obligations under the Fund Agreements.

250.     The covenant of good faith and fair dealing is an implied term of the Fund Agreements. Pursuant to Section 2.06 of the LLC Agreements, AllianzGI is not exculpated from liability caused by bad faith conduct.

251.     Pursuant to Section 1.07 of the LLC Agreements, the Fund was "organized for the purposes of investment of the assets contributed to the [Fund]."

252.     The PPM further provides that the investment objective of the Fund is to outperform the BofA Merrill Lynch 3-Month U.S. Treasury Bill Index by approximately 10%, net of fees and expenses.

253.     Pursuant to Sections 2.03 of the LLC Agreements, AllianzGI, as investment manager, had a duty to make investment decisions in furtherance of the Fund's investment objective.

254.     To the extent that AllianzGI had discretion under the LLC Agreements in its investment decisions, AllianzGI exercised that discretion unreasonably and in bad faith by, among other things: (a) adjusting its investment strategy, without informing Getty, to no longer be directionally-neutral; (b) purchasing insufficient long put options to adequately hedge the Fund's risks; and (c) failing to conduct adequate risk assessments for different market scenarios and that take into account AllianzGI's actual investment strategies.

255.     Furthermore, in response to the market downturn in the first quarter of 2020, AllianzGI failed to take steps to mitigate the damage done by its changed investment strategy and instead doubled-down on its bet, gambling that the market and the VIX would recover quickly. Accordingly, AllianzGI also exercised its discretion unreasonably and in bad faith by, among other things: (a) failing to close out options positions pursuant to the stop-loss method; (b) selling significant amounts of its protective long put options to extend short put contracts and respond to margin calls; and (c) abandoning its systematic strategy in favor of an ad hoc bet on the market's direction. In doing so, AllianzGI frustrated the fruits of the bargain that Getty reasonably expected.

256.     AllianzGI's unreasonable and bad faith exercise of discretion caused the Fund to lose approximately 97% of its value in the first quarter of 2020, thereby frustrating the Fund's express investment objectives and Getty's reasonable expectations for modest returns on its investments with substantial downside protection.

257.     AllianzGI has therefore breached the implied covenant of good faith and fair dealing.

258.     Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

259.     By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

260.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

261.     As a direct and proximate result of Allianz's breaches of the contracts' implied covenant of good faith and fair dealing, Getty has lost a substantial portion of its investment in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

### COUNT IX: UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS)

262.     Getty restates and realleges paragraphs 1 to 261 as though fully set forth herein.

263.     AllianzGI earned management fees directly tied to its overperformance against each Fund's corresponding benchmark index.

264.     AllianzGI materially deviated from its purported investment strategy throughout the existence of the Fund, but in no event later than April 2019.

265.     To the extent AllianzGI took illicit steps to, among other things, make directional bets on volatility and equity growth with Getty's capital, its management fees were improperly inflated to its own benefit.

266.     These decisions operated to the detriment of Getty. The moment market conditions stopped facilitating AllianzGI's gambit (in ways that were reasonably foreseeable and consistent with AllianzGI's own assumptions), Getty suffered catastrophic losses.

267.     There was no good-faith justification for AllianzGI's unnecessary risk taking, and it would not be equitable for AllianzGI to retain management fees accrued through unauthorized bets made prior to the market dislocation.

268.     As these fees were paid as a percentage of capital gains in the accounts of Getty, AllianzGI enriched itself directly at Getty's expense by pursuing a strategy that was neither disclosed, nor sanctioned. AllianzGI's ability to accrue these illegitimate fees was further enhanced by soliciting additional investments after it had abandoned its market-neutral mandate to chase profits.

269.     Allianz SE is liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

270.     By virtue of the unified corporate structure of Allianz as alleged above, Allianz SE had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

271.     AllianzGI and Allianz SE acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

272.     Getty is thus entitled to an amount to be determined at trial.

### COUNT X:  VIOLATION OF CAL. CORP. CODE § 25401

273.     Getty restates and realleges paragraphs 1 to 271 as though fully set forth herein.

274.     AllianzGI, in the State of California, intentionally and/or recklessly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading in connection with Getty's purchase of shares in the Fund, which constitute securities, in violation of Cal. Corp. Code § 25401.

275.     AllianzGI knowingly and intentionally made materially false representations, including, but not limited to, its representations in the 1Q19 quarterly report that the Fund was market agnostic and designed to profit in any volatility environment. In fact, AllianzGI knew, at the time it made such statements, that the Fund was short volatility and would not profit in a declining stock market with high volatility, because by at least April 2019, it had knowingly and intentionally restructured its investment strategy to bet on market stability and, thus, short volatility, as reflected by the fact that the gamma for the portfolios had nearly quadrupled. Such strategic positioning ensured that the Fund, contrary to AllianzGI's representations, would lose value in a declining stock market.

276.     AllianzGI also intentionally or recklessly failed to disclose numerous material facts, the omission of which rendered AllianzGI's prior representations false and misleading. This includes, but not is not limited to:

a.  Directional Bet. AllianzGI knowingly failed to disclose that it had restructured the Fund to bet on market directionality by April 2019. AllianzGI also had a duty to monitor the Fund's gamma risk as investment manager; it therefore knowingly or recklessly failed to disclose to Getty that the negative gamma values for the Fund had increased substantially as a result of its change in strategy. In failing to make these material disclosures, AllianzGI intentionally or recklessly concealed from Getty that the Fund was no longer market agnostic, in direct contravention of AllianzGI's express and repeated representations.

b.  Put Options. AllianzGI knowingly failed to disclose that it had purchased an inadequate number of put options and that the strike prices of a significant number of put options it did purchase were far below the price range it had previously represented to Getty in numerous presentations. This resulted in the Fund having far less downside protection than AllianzGI had consistently represented.

c.  Risk Exposure. AllianzGI was responsible for monitoring the Fund's risk exposure as their investment manager, and AllianzGI therefore knowingly or recklessly failed to disclose to Getty that, as a result of its covert change in strategy (i) the Fund's downside risk vastly exceeded the risks set forth in its presentations and (ii) the Fund was highly correlated to movements in their respective market indexes, which rendered them much more exposed to market fluctuations than AllianzGI had led Getty to believe.

   d. <u>Risk Management</u>. AllianzGI knowingly failed to disclose that it never

   conducted stress tests for a multi-day market decline, which contradicts

   its repeated representations that it had robust risk management

   procedures (i) to provide for the "analysis of statistically significant

   equity-market scenarios" and (ii) to provide "monitoring based on

   statistical equity index behavior."

277.    AllianzGI had a duty to disclose these material omissions, because
AllianzGI owed Getty duties of care and loyalty as the Managing Member and investment
manager of the Fund, which was the fund in which Getty invested as a Non-Managing
Member. Throughout their multi-year relationship, Getty reposed trust in AllianzGI and
AllianzGI accepted that trust, forming a fiduciary relationship, which required AllianzGI to
make truthful disclosures of material information. Additionally, disclosure was required to
correct AllianzGI's misleading statements, and because AllianzGI had unique access to the
withheld information.

278.    Not only did AllianzGI knowingly withhold key information and thereby
engage in conscious misbehavior, AllianzGI had the motive to do so, because its
undisclosed new investment strategy generated higher incentive fees for AllianzGI.

279.    AllianzGI also had the motive to keep its new strategy secret, because
the strategy directly contradicted its long-standing representations to Getty and other
structured Alpha investors about the low-risk nature of the Fund. AllianzGI knew that its
failure to adhere to the Fund's mandate would likely result in mass investor redemptions,
and therefore intentionally concealed its change in strategy.

280.    AllianzGI made these material misrepresentations or omitted to disclose
the material facts with the intention of inducing Getty, in reliance thereon, to make an

additional investment in the Fund after March 2019, from which AllianzGI could earn additional incentive management fees.

281.    Getty reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, in deciding to purchase an additional investment in the Fund. Getty could not have known that AllianzGI's representations were false or misleading until the Fund collapsed in the face of the 2020 market crash, because AllianzGI concealed material information.

282.    Had Getty known that the information it received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Getty would not have made an investment in the Fund on May 1, 2019 in the amount of $10 million.

283.    AllianzGI's misrepresentations and omissions directly and proximately caused Getty's losses. As described above, and as evidenced by the Fund's severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Getty's losses—and not the market decline in February and March 2020.

284.    As a direct and proximate result of AllianzGI's material misrepresentations and omissions, Getty has lost a substantial portion of its investment in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

**COUNT XI:  VIOLATION OF CAL. CORP. CODE § 25504**

285.    Getty restates and realleges paragraphs 1 to 284 as though fully set forth herein.

286.    At all relevant times, Allianz SE owned and controlled AllianzGI, as fully alleged above. Among other things, Allianz SE, as the parent company of the Allianz

Group, marketed itself as an integrated financial conglomerate and was responsible for: (a) setting the business objectives and strategic direction for AllianzGI; (b) setting the risk management framework for AllianzGI; and (c) oversight of AllianzGI's research, investment, and trading activities.

287.    Allianz SE culpably participated in AllianzGI's violations of Cal. Corp. Code § 25401. Among other things, Allianz SE knew or should have known that AllianzGI made material statements and omissions to Getty and that AllianzGI altered its investment strategy, was no longer market agnostic or adequately hedged in the manner AllianzGI had presented, and failed to conduct adequate stress tests or provide adequate risk reports to investors like Getty.

288.    Allianz SE had the opportunity and ability to quash the fraud by disclosing the material misrepresentations and omissions by AllianzGI.

289.    Allianz SE had the ability to supervise and control the activities of AllianzGI, did in fact exercise such control, culpably participated in the violations of Cal. Corp. Code § 25401 alleged herein, and was therefore a controlling person of AllianzGI and within the meaning of Cal. Corp. Code § 25504.

290.    As a direct and proximate result of Allianz SE's misconduct, Getty lost a substantial portion of its investments in the Fund. Getty is therefore entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELEIF

Getty requests that the Court enter judgment in its favor against Allianz and an Order granting the following relief:

a.   Compensatory damages in an amount exceeding $75,000, with the exact amount to be proven at trial;

b.   Punitive damages, with the exact amount to be proven at trial;

    c.   An order awarding pre- and post-judgment interest to Getty; and

    d.   Any such other legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

Getty demands a jury trial on all issues so triable. *See* Fed. R. Civ. P. 38(b).


Dated:  March 3, 2022


Respectfully Submitted,

By:  */s/ John P. Flynn*                  

John P. Flynn, Bar No. JF1987
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2130
Facsimile: (415) 947-2099

Matthew A. Macdonald (*pro hac vice forthcoming*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone: (323) 210-2953
Facsimile: (866) 974-7329

*Attorneys for Plaintiff*
*The J. Paul Getty Trust*